## STATE OF MARYLAND *v.* JAMES MITCHELL JOURDAN, JR.

[No. 933, September Term, 1973.]

*Decided September 18, 1974.*

The cause was argued before ORTH, C. J., and MOYLAN and MENCHINE, JJ.

*David B. Allen, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *David K. Rumsey, Assistant State's Attorney for Prince George's County,* on the brief, for appellant.

*Patrick R. Hudson, Assigned Public Defender,* with whom was *Edward P. Camus, Public Defender for Prince George's County,* on the brief, for appellee.

ORTH, C. J., delivered the opinion of the Court.

On 9 September 1971 JAMES MITCHELL JOURDAN, JR. was found guilty by a jury in the Circuit Court for Prince George's County of storehouse breaking with intent to steal goods over the value of $100. On 12 October 1971 he was sentenced to imprisonment for a term of 6 years. The judgment was affirmed on direct appeal. *Jourdan v. State,* No. 626, September Term, 1971, unreported, *cert. den.,* 266 Md. 738.

On 5 June 1973 Jourdan filed a petition for relief under post conviction procedures and, upon hearing, the Circuit Court for Prince George's County, by its order of 17 December 1973, "set aside" the judgment on the ground that Jourdan had been denied genuine and effective representation at his trial by reason of the failure of his attorney to raise the issue of double jeopardy. On 16 January 1974, the State, alleging that the hearing judge erred in reversing the judgment, applied for leave to appeal. Code, Art. 27, § 645-I; Maryland Rule BK46. We granted the application, *State v. Jourdan,* No. 133, Application for Leave to Appeal, September Term, 1973, filed 14 February 1974, unreported, and by our order the same date the case was transferred to the regular appeal docket of this Court for further proceedings pursuant to Chapter 1000 of the Maryland Rules of Procedure. Rule BK47. Briefs were duly filed and argument presented.

The history of Jourdan's cases for criminal violations runs the gamut of our criminal process. The indictment upon which Jourdan was found guilty and sentenced was handed up on 9 May 1971 by the Grand Jury for Prince George's County. The True Bill, classified as Trial number 11, 137 presented in Count I that "James Mitchell Jourdan, Jr., a/k/a Frederick Mitchell Ray, a/k/a James Mitchell Nebergall", on 7 December 1970 did break into the storehouse of Advertising Distributors of Washington, Inc. with intent to take and carry away certain goods and chattels of the value of one hundred dollars or more. Count II presented that Jourdan did unlawfully break into said storehouse with intent to steal money, goods and chattels under the value of one hundred dollars, and Count III presented that Jourdan did steal and carry away from Advertising Distributors of Washington, Inc. "assorted cigarettes and several checks of the value of eighty-nine dollars and ninety cents . . . ." Consolidated with that case on the day of trial was case number 11,147, then pending, charging forgery and uttering of a payroll check stolen during the incident described in the indictment of case 11,137.[1]

The consolidated cases came on for trial on 21 May 1971. After determining that Jourdan was fully satisfied with the attorney appointed to represent him, a jury was duly impaneled and sworn, prospective witnesses were removed from the courtroom and Vincent J. Femia, Deputy State's Attorney, made an opening statement. Jourdan reserved his opening statement. The State immediately called as its first witness, Jess Edward Ditzler, who was duly sworn and, upon questioning by Mr. Femia, identified himself as the "production manager" for Advertising Distributors of Washington, Inc. Ditzler began to relate the disarray he observed upon arriving for work on 7 December 1970, the

---

1. Jourdan was also charged with housebreaking (case no. 10,634) and attempted escape (case no. 11,073). At trial on 21 May 1971 a *nolle prosequi* was entered as to no. 10,634, and the disposition of no. 11,073 was taken under advisement by the court pending the completion of consolidated cases nos. 11,137 and 11,147.

morning the break-in was discovered,[2] when Mr. Femia was suddenly taken ill. The transcript reads:

"MR. FEMIA: Your Honor, may we approach the bench?

THE COURT: Yes, you may.

(Whereupon counsel approached the bench and the following proceedings were had out of the hearing of the jury:)

MR. FEMIA: I am not — well, I am about to —

THE COURT: Court will recess for a few minutes, and Madam Clerk, keep me advised.

(Whereupon court was recessed for a few minutes at the conclusion of which counsel returned to the bench and the following proceedings were had:)

THE COURT: * * * the court indicates this matter was recessed approximately 2:10 in the afternoon after Mr. Femia made his way to the bench indicating that he was having trouble and it being very obvious to the court he was shaking like a leaf and when he went back to the bench Mr. Ahalt [Defense Counsel] handed him a glass of water. He was shaking so badly he could hardly take hold of the glass. Do you agree with that Mr. Ahalt?

MR. AHALT: That is correct, Your Honor.

THE COURT: Under the circumstances Mr. Muskus has been sent to the courtroom, the State's Attorney, Mr. Femia, having returned to the confines of the State's Attorney's lounge. It now being 25 minutes after 2:00, Mr. Muskus from the State's Attorney's office has appeared in court. Now the court will hear you."

---

2. Mr. Ditzler testified that he observed a broken glass in the window of the "employees entrance door", that the vending machines in the employee's lunch room had been broken into and that the safe was out of place and "punctured" on the side.

Mr. Muskus requested that the court take one of two courses of action in light of Mr. Femia's infirmity. He first suggested, "so as not to pose a problem of double jeopardy," that Jourdan consent to the court's granting a mistrial in the case. In the alternative Muskus requested, on behalf of the State's Attorney, that the court "continue this case until next week when Mr. Femia would be free to return and then try the case." Jourdan, through his counsel, apparently opposed continuing the case, suggesting ". . . that the case be set back in for trial at the earliest possible jury date." The court, stating that "[t]here is no indication [Jourdan] voluntarily consents", chose to "declare a mistrial believing that Mr. Muskus did not have the background" to present the State's case. The court stated:

"It took us a considerable amount of time to get the whole situation into the appropriate complexion for its disposition and this is the last day for this jury for some substantial period of time. If I recess the case it would necessitate them [the jury] coming back in when they were not assigned as jurors. They cannot be used in any other jury case while this was recessed. * * * [T]hus, I declare a mistrial in the trial of Criminal Trials Nos. 11,137 and 11,147."

The State saw the court's ruling as a harbinger of future problems in that Jourdan could contend there was "no ground for mistrial", "that the case should have been continued" and that Jourdan could claim "double jeopardy" at a "later date." The court disagreed, believing the matter was one subject to the court's "discretion under the circumstances" and that Mr. Ahalt would consent on behalf of Jourdan. Mr. Ahalt agreed, "That is correct, Your Honor." Mr. Muskus inquired:

"So far as the defendant is concerned there is no problem declaring a mistrial, is that correct? "

Mr. Ahalt: "That is correct." .

As a further "precaution", Mr. Muskus sought Jourdan's

personal consent to a mistrial. The court interrupted Mr. Muskus's request, stating, ". . . the court has disposed it as a mistrial", and directed the State and Jourdan's attorney to set the case for trial "at the earliest practical date."

On 7 September 1971 Jourdan was again brought to trial before the Circuit Court for Prince George's County and a jury. With the exception of a discussion of whether the State would go forward in case 11,147 (forgery and uttering) Mr. Ahalt made no comment nor did he raise any preliminary motions prior to the jury being impaneled and trial commencing. After more than a full day of testimony and argument the jury rendered a verdict of guilty as to Count One, Criminal Trials 11,137, storehouse breaking over $100; not guilty as to all counts in Criminal Trials 11,147." Subsequently, Jourdan, through his attorney, Mr. Ahalt, appealed his conviction, questioning whether he "knowingly and voluntarily waived his rights against self-incrimination and voluntarily confessed to the crime." As indicated, the judgment of the lower court was affirmed on direct appeal and certiorari was denied by the Court of Appeals.

On 5 July 1973, Jourdan, in proper person, filed a "Petition for Post Conviction Relief" alleging error in the admission of his confession, the voluntariness of his confession, denial of his constitutional rights under *Miranda v. Arizona*, 384 U.S. 436, denial of a speedy trial, and denial of "choice of counsel" and asserting that therefore his conviction and sentence were "illegal." On 24 August 1973 Jourdan, through his attorney, Patrick R. Hudson, assigned by the Public Defender, filed an "Amended Petition for Post Conviction Relief" alleging that Jourdan's confession was not voluntary, that he was denied a speedy trial and that he was "twice placed in jeopardy for the same offense in violation of Article V of the United States Constitution . . . ." A hearing on the petition was scheduled for 15 October 1973 at which time the State moved for a dismissal without hearing. The court granted that motion. On 24 October 1973, upon Jourdan's filing of a "Post-Hearing Memorandum", the court ordered that an evidentiary hearing be held.

At hearing on 26 November 1973, Jourdan called as

witnesses Eugene Muskus, Vincent J. Femia and Arthur M. Ahalt. Mr. Muskus testified that he was an experienced prosecutor in the State's Attorney's office and that on 21 May 1971, in the afternoon, he was informed by the State's Attorney that Mr. Femia was ill and was directed to go to Courtroom number 1 and request a "continuance, so that [Mr.] Femia could recover and assume responsibilities in the case". Mr. Muskus testified that he had not seen the file in Jourdan's case, had not had an "opportunity to review the State's file" and was unfamiliar with any of the State's witnesses. He believed "at that particular time" he "could not take over the trial" and he requested, as the transcript of the proceeding illustrates, a continuance. He testified that he never suggested a mistrial and that when the court did so, *sua sponte*, he persistently sought defense counsel's agreement as a "double precaution" because of "the issue of double jeopardy." Mr. Muskus recalled that Mr. Ahalt was "reluctant to consent"; it was "not his desire to consent."

Vincent J. Femia testified that in the morning of 21 May 1971 he finished a case he was trying on behalf of the State and after lunch "picked up" Jourdan's case from another prosecutor. He understood that all of the State's witnesses were present except one and, after reviewing the State's case for 10 or 15 minutes, "more than ample" preparation though he knew "nothing of the defendant; knew nothing of the prior motions in the case", he went to trial. He recalled the impaneling of the jury and offering Mr. Ditzler as the State's first witness. He vaguely remembered informing Judge Mathias that he felt faint and then sitting down. "The next thing [he] remember[ed] [he] was up in the State's Attorney's office." Though he resisted going to the hospital, he went to his doctor and underwent a "rather complete physical." His illness was diagnosed as "exhaustion." He did not return to work for more than a week.

Arthur M. Ahalt, Jourdan's attorney at trial, testified that prior to 21 May 1971 the case had been continued several times and that he wanted to proceed. After trial commenced he noticed that for about five minutes Mr. Femia "was not able to ask questions", "was white, ashen" and that "the man

was sick." After Mr. Femia sat down at the trial table, Mr. Ahalt poured him a glass of water. Mr. Ahalt testified that Mr. Femia "could hardly hold the glass." He testified further that the only time he saw Mr. Muskus was in Judge Mathias's chambers and that he had the impression Mr. Muskus did not want to try the case. Mr. Ahalt recalled the court, *sua sponte,* declaring a mistrial and that Jourdan's concern was over the ensuing delay.

Jourdan testified that during his imprisonment pending trial he wrote letters "to the Supreme Court, Legal Aid Bureau, to my attorneys, to the Court, to Mr. Taylor . . ., my Judge, to Judge Parker . . . asking to be tried." He also "addressed the writ of Federal Habeas Corpus to the District Court of Maryland" and filed "a motion for a quick and speedy trial" in proper person. His efforts were to expedite the proceedings in his case.

Jourdan testified that at his first trial on 21 May 1971 the State called its first witness and "then there was a lot of commotion. People kept going up to the benches and stuff. Finally the prosecutor was taken away . . . ." He knew nothing "of any continuance." He said, "I had been lying on the south wing of the penitentiary for six or seven months. I certainly didn't want a continuance." Jourdan testified that he remembered the court declaring a mistrial, that he could not "really say that [his] attorney objected", and that he was not asked to concur in it. The court asked the question, "Did you consent to a mistrial on May 21st? " Jourdan replied, "No, Sir, I never consented."

On 17 December 1973 the court filed its "Memorandum and Order." In the court's view, in light of *Baker, Whitfield and Wilson v. State,* 15 Md. App. 73, *U. S. v. Perez,* 22 U. S. (9 Wheat.) 579 and *Gori v. U.S.,* 367 U. S. 364, "the events leading up to trial of Mr. Jourdan on May 21, 1971 as well as the proceedings during the course of that trial [led it] to believe that jeopardy attached upon the *sua sponte* declaration of a mistrial." The court so held upon consideration of Mr. Femia's ". . . assignment to the case, the time necessary to prepare himself, the presence of or availability of his witnesses in conjunction with Mr.

Muskus's period of employment as a prosecutor, his experience in the prosecution of cases such as those for which Mr. Jourdan was charged as well as a consideration of the time frame in which the proceedings were commenced and terminated." The court believed that Arthur Ahalt's failure to raise the issue of double jeopardy, in light of the circumstances and the discussions had when the mistrial was declared, denied Jourdan "the effective assistance of counsel." On appeal the State presents for our consideration the question of whether "the verdict of the trial court [was] clearly erroneous." [3]

We have, as is our constitutional duty, carefully reviewed the record before us and believe that the court below reached the wrong conclusion. In our view, Jourdan was neither twice placed in jeopardy nor denied the genuine and effective assistance of counsel.

In *Baker, Whitfield and Wilson v. State, supra,* we had occasion to set out the standard for determining whether retrial following a *sua sponte* judicially declared mistrial without the defendant's consent is prohibited by the double jeopardy clause of the fifth amendment. That standard is to determine "whether the mistrial declared was an abuse of judicial discretion." *Baker,* at 89. We elaborated:

> "We are satisfied that 'abuse of judicial discretion' is to be assessed by the manifest necessity standard of *Perez* as explicated by *Gori.* We are persuaded that the proper interpretation of *Gori* is that of the Stewart opinion in *Jorn* [United States v. Jorn, 400 U. S. 470]. Therefore, we shall determine whether reprosecution in the cases now before us would violate the fifth amendment guarantee against double jeopardy by reference to the purpose and effect of the mistrial ruling

---

3. On appeal the State does not question whether Jourdan intelligently and knowingly waived the issues of double jeopardy or effective assistance of counsel. Code, Art. 27, § 645A (c). Jourdan insists in his brief that he did not. For the purpose of this opinion we shall assume, but do not specifically so decide, that on the facts of this case these allegations of error were not waived.

concerned and by considering abuse of the trial court's discretion in declaring the mistrial in the context of whether there was an abuse of the trial process resulting in prejudice to the accused, by way of harassment or the like, such as to outweigh society's interest in the punishment of crime. Cf. *United States v. Walden*, 448 F. 2d 925 (4th Cir. 1971); *United States ex rel. Somerville v. Illinois*, 447 F. 2d 733 (7th Cir. 1971); *United States v. LeMay*, 330 F. Supp. 628 (Montana, 1971); *United States v. Medina*, 323 F. Supp. 1277 (Pa. 1971); *United States v. Pappas*, 445 F. 2d 1194 (3rd Cir. 1971)."

We observed further that within the principles established by the Supreme Court "each case is to be decided on its own facts", there being no mechanical rule controlling nor rules formulated based on categories of circumstances. The only greater definition the Supreme Court has attempted to impose upon these standards is to lay down, through case law, a "general approach" or "some guidelines" which a trial court may consider in exercising its discretion. Significant among them is that a mistrial should only be declared when " 'manifestly necessary', or 'under urgent circumstances', or '. . . in very extraordinary and striking circumstances'," and never should be "lightly undertaken." *Cornish v. State*, 272 Md. 312, citing *United States v. Perez, supra; United States v. Coolidge*, 2 Gall. 364, 25 Fed. Cases 622, Fed. Case No. 14,858 (C.C. Mass. 1815); *Downum v. United States*, 372 U. S. 734; *United States ex rel. Somerville v. Illinois, supra.*

In our view, the trial court in declaring a mistrial when Mr. Femia, the prosecutor, was suddenly and then inexplainably taken ill, followed the prescribed standards. It is certain that Jourdan was first placed in jeopardy at his original trial; the guarantee of the fifth amendment being implicated when the jurors were sworn and trial commenced. *Blondes v. State*, 19 Md. App. 714. But under the manifest necessity standard we believe the trial court properly exercised its discretion when it determined that the

declaration of a mistrial was dictated by the circumstances. Our independent constitutional appraisal of the entire record leads us to the inescapable conclusion, and we find as a constitutional fact, that the overriding purpose of declaring the mistrial was to assure that Jourdan be afforded a fair trial at which the charges against him could and would be properly set forth and the evidence accurately presented. The court noted before its declaration of mistrial that the case against Jourdan was not a simple one ". . . because of the complexity of this defendant with the various names and various cases" then pending. The court stated that it had gone to considerable trouble and spent some time trying to understand and sort out the various charges pending against Jourdan, had consolidated certain cases and sought to put the case in an "appropriate complexion for its disposition." It clearly believed that Mr. Muskus, who had not been privy to those preliminary matters, had not seen the record, knew nothing of the case, and was unfamiliar with the witnesses, was in no position to go forward. It is inconceivable to us that, in the circumstances of this case, an unprepared assistant State's Attorney could possibly be expected to proceed immediately. The status of the jury, as pointed out by the trial court, mitigated against the grant of a continuance. The trial court's decision here was clearly no abuse of discretion, was manifestly necessary and was in no way designed merely to aid the prosecution. See *Downum v. United States, supra.*

In reaching our conclusion we have given due consideration to the factors the hearing court indicated supported its view that Jourdan was twice placed in jeopardy. The court considered as significant Mr. Femia's brief preparation and Mr. Muskus's status as an experienced prosecutor as showing that the trial could properly have proceeded to conclusion. We do not see it that way. The granting of the mistrial in the instant case was not for the purpose of allowing the State to marshal sufficient evidence to succeed, *United States v. Shoemaker*, 2 McLean 114, 27 Fed. Cas. 1067, Fed. Case No. 16,279 (C.C. Ill. 1840), or to harass the accused by successive prosecutions, *Downum v. United States, supra,* or merely to accommodate the court's

convenience, *Commonwealth v. Wideman,* 453 Pa. 119, 306 A. 2d 894. It was rather to assure no abuse of the trial process resulting in prejudice to Jourdan's cause.

Jourdan refers us in his brief to *United States v. Watson,* 3 Ben. 1, 28 Fed. Cas. 499, Fed. Case No. 16,651 (S.D.N.Y. 1868) wherein the court held that in the circumstances of that case the granting of a mistrial due to the illness of the District Attorney barred subsequent reprosecution. We find that case inapposite. In *Watson,* there was no showing that the District Attorney's illness occurred after the jury was sworn or that, due to the circumstances, it was practically impossible for an assistant district attorney to conduct the trial. As we have observed, in the instant case both factors coalesced, supported the trial court's determination, and, coupled with the fact that the impaneled jury was at the end of its term, precluded, we believe, any reasonable alternative. See *United States v. Jorn, supra.*

In short, on our independent constitutional review, we believe that Mr. Femia's illness, occurring when it did, created the "urgent", "extraordinary" and "striking" circumstances that made the court's declaration of a mistrial, *sua-sponte,* manifestly necessary. Since *Benton v. Maryland,* 395 U. S. 784, we have been consistent in our view that the Supreme Court's constitutional constructions and interpretations of the fifth amendment are applicable in Maryland. We so stated in *Baker, Whitfield and Wilson v. State, supra,* where we further observed that the Supreme Court's mandate requires us to "ascertain the views of that Court as to its construction of the federal constitution and apply them in a particular factual posture." 15 Md. App. at 78. We have done exactly that in the instant case and believe Jourdan was not twice placed in jeopardy in the constitutional sense at his second trial.

As Jourdan was not denied the guarantee of the fifth amendment's protection against double jeopardy, it follows that his trial attorney's failure to raise the issue as a defense prior to or during his second trial did not deny him the genuine and effective assistance of counsel.

*Order of 17 December 1973 reversed.*